IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | CONSOLIDATED UNDER |
| LIABILITY LITIGATION (No. VI) | : | MDL DOCKET NO. 875 |
| | : | |
| | : | |
| HECTOR L. SANCHEZ, et al. | : | |
| | : | Certain cases on the |
| v. | : | 02-md-875 Maritime Docket |
| | : | (MARDOC), listed in the |
| VARIOUS DEFENDANTS | : | attached Exhibit A |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          July 9, 2014

Table of Contents

I. Introduction ...............................................1

II. Legal Standard ............................................3

III. Discussion ...............................................5

  A. Punitive Damages Under General Maritime Law...............6

    1. Remedies Historically Available in Maritime Law .........7

    2. Punitive Damages in Unseaworthiness Claims .............21

    3. Survival Actions .......................................32

    4. Reconciling General Maritime Law with
      Statutory Enactments....................................35

  B. Punitive Damages in Asbestos Cases.......................36

  C. Adequacy of the Pleadings................................51

IV. Conclusion ...............................................53

**I.   INTRODUCTION**

Currently before the Court are twenty-seven of the approximately 1800 motions for judgment on the pleadings

regarding punitive damages claims that have been filed in cases that are part of the maritime docket ("MARDOC") in MDL 875, the consolidated asbestos products liability multidistrict litigation pending in the District Court for the Eastern District of Pennsylvania.[1] Plaintiffs in these cases are various

---

[1]   As of June 30, 2014, 186,592 cases have been transferred to MDL 875. See MDL 875 Statistics, U.S. District Ct. E. District of Pa., http://www.paed.uscourts.gov/mdl875t.asp (last visited July 7, 2014). For substantive, procedural, and administrative reasons, the cases in MDL 875 have proceeded on two separate dockets, one of which is the MARDOC. At its largest, the MARDOC totaled 63,370 cases, and there are approximately 2,678 cases currently pending. Id. For an overview of the history of the MARDOC, see Bartel v. Various Defendants, 965 F. Supp. 2d 612 (E.D. Pa. Aug. 26, 2013) (Robreno, J.). See also, generally, Hon. Eduardo C. Robreno, The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?, 23 Widener L. J. 97 (2013).

The other docket in the MDL, which includes land-based cases, has totaled 123,222 cases, and it has approximately 140 active cases currently pending. See MDL 875 Statistics. The Court has remanded more than 600 land-based cases to 59 transferor districts. When a case is remanded, it is the Court's regular practice to sever any claims for punitive or exemplary damages and retain jurisdiction over these claims in the Eastern District of Pennsylvania. See In re Collins, 233 F.3d 809, 810 (3d Cir. 2000) ("It is responsible public policy to give priority to compensatory claims over exemplary punitive damage windfalls; this prudent conservation more than vindicates the Panel's decision to withhold punitive damage claims on remand."). The Court is not aware of any case that has been remanded to the transferor court from the MARDOC since at least 2008. Accordingly, no claims for punitive damages have been severed or retained by the Court from cases on the MARDOC. For these reasons, punitive damages claims have effectively proceeded along two separate tracks according to each respective docket.

merchant marines and their representatives, survivors, and spouses, and Defendants are shipowners. Defendants have moved for partial judgment on the pleadings with respect to Plaintiffs' claims for punitive damages. The motions raise these significant issues in this litigation:

> (1)   Are punitive damages available to seamen bringing actions based on the general maritime doctrine of unseaworthiness?

> (2)   If so, are punitive damages available under maritime law in cases arising from exposure to asbestos?

> (3)   If so, do the pleadings in these cases claiming entitlement to punitive damages, which were filed prior to the Supreme Court's decisions in Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009), comport with Federal Rule of Civil Procedure 12(b)(6)?

For the reasons that follow, the Court will grant the motions for judgment on the pleadings with leave for certain Plaintiffs to file amended complaints.


## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Judgment on the pleadings is appropriate only if "the moving party clearly establishes there are no material issues of fact, and that he or she is entitled to judgment as a matter of law." DiCarlo v. St. Mary Hosp., 530 F.3d 255, 259 (3d Cir. 2008). In

reviewing a Rule 12(c) motion, a court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290-91 (3d Cir. 1988)).

When a party's Rule 12(c) motion is "based on the theory that the plaintiff failed to state a claim," the motion is "reviewed under the same standards that apply to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." Caprio v. Healthcare Revenue Recovery Grp., LLC, 709 F.3d 142, 146-47 (3d Cir. 2013). In order to withstand a motion to dismiss, a complaint must include factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 & n.3 (2007). Satisfying that standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Rather, the pleadings "must contain sufficient factual matter, which if accepted as true, states a facially plausible claim for relief." Caprio, 709 F.3d at 147. A claim possesses such plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

4

## III. DISCUSSION

Defendants' motions present the question of under what circumstances, if any, are punitive damages available under maritime law, an issue that has become somewhat unsettled in the wake of the Supreme Court's decision in <u>Atlantic Sounding Co. v. Townsend</u>, 557 U.S. 404 (2009). According to Defendants, punitive damages are unavailable under the general maritime doctrine of unseaworthiness, which is the cause of action upon which Plaintiffs base their punitive damages claims. Defs.' Mem. Supp. Mot. J. Pleadings 3, ECF No. 1993.[2] Plaintiffs disagree, arguing that, under the test established in <u>Atlantic Sounding</u>, punitive damages can be awarded in unseaworthiness claims. Pls.' Resp. 1-2, ECF No. 2071. Plaintiffs further contend that punitive damages are proper not only in actions alleging unseaworthiness brought by injured seamen directly, but also in survival actions based upon such claims. <u>Id.</u> at 7-9. The crux of this dispute is therefore the proper scope of the remedies available under general maritime law.

---

[2] In this Memorandum Opinion, the Court cites to one particular motion by Defendants and one response from Plaintiffs. Those briefs are identical (or nearly identical) to the briefs submitted by the other parties to this litigation, and therefore are fully demonstrative of all of the parties' arguments.

In addition to that issue, the circumstances of these cases require the Court to consider whether punitive damages are ever appropriate in asbestos-related cases brought under maritime law, and, if so, what circumstances might warrant that remedy. Based upon those determinations, the Court must then decide if the particular pleadings at issue here can support punitive damages claims. Each of those considerations is addressed in turn, beginning with the availability of punitive damages in maritime law.

A.  <u>Punitive Damages Under General Maritime Law</u>

The primary issue presented by these motions is whether punitive damages are permissible as a matter of law in general maritime claims for unseaworthiness. To date, there is no binding precedent from the Supreme Court or the Third Circuit addressing precisely this question. The Supreme Court has, however, decided several similar cases in recent years that articulate the general principles that guide this Court's analysis. The Court will therefore begin its discussion by describing the history of the Supreme Court's jurisprudence regarding the remedies available under general maritime law, and then will consider the application of that jurisprudence to these motions.

## 1.  Remedies Historically Available in Maritime Law

Traditionally, general maritime law provided a seaman with two causes of action against his employer. Cortes v. Baltimore Insular Lines, 287 U.S. 367, 370-71 (1932); see also McBride v. Estis Well Serv., L.L.C., 731 F.3d 505, 508 (5th Cir. 2013), reh'g en banc granted, 743 F.3d 458 (2014). First, a seaman injured on board his ship had a claim for "maintenance and cure" if the vessel owner breached his duty "to provide food, lodging, and medical services" to the seaman. Atlantic Sounding, 557 U.S. at 407-08. Second, and more relevant here, a seaman could bring a claim of unseaworthiness to recover for an injury "suffered as a consequence of the unseaworthiness of the ship or a defect in [its] equipment." Cortes, 287 U.S. at 371. The Supreme Court has recognized unseaworthiness as a strict liability tort, which means that a shipowner is "liable for failure to supply a safe ship irrespective of fault and irrespective of the intervening negligence of crew members." Miles v. Apex Marine Corp., 498 U.S. 19, 25 (1990) (citing Mahnich v. Southern S.S. Co., 321 U.S. 96, 100 (1944)).

Historically, those two causes of action represented the only two circumstances under federal law in which a seaman could recover from his employer for injuries incurred during his employment. Cortes, 287 U.S. at 370-71. There was no general

maritime cause of action for injuries caused by an employer's negligence. <u>Atlantic Sounding</u>, 557 U.S. at 415 (citing <u>The Osceola</u>, 189 U.S. 158 (1903)). Nor was there a possibility for recovery if the seaman died from his injuries, as the general maritime law did not permit survival or wrongful death actions.[3] <u>Moragne v. States Marine Lines, Inc.</u>, 398 U.S. 375, 379-80 (1970); <u>see also</u> <u>Cortes</u>, 287 U.S. at 371 (noting that a seaman's "remedy for the injury ends with his death in the absence of a statute continuing it or giving it to another").

Seamen could, however, recover punitive damages – at least theoretically. As the Supreme Court explained in <u>Atlantic Sounding</u>, "[p]unitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct," 557 U.S. at 409, including in claims arising under federal maritime law, <u>id.</u> at 411. Indeed, according to the majority opinion in <u>Atlantic Sounding</u>, "maritime jurisprudence was replete with judicial statements approving punitive damages, especially on behalf of passengers and seamen."[4] <u>Id.</u> at 412 (quoting David W.

---

[3]     A wrongful death action is an action brought by the family or dependents of the deceased "to recover for harm that <u>they</u> personally suffered as a result of the death." <u>Calhoun v. Yamaha Motor Corp., U.S.A.</u>, 40 F.3d 622, 637 (3d Cir. 1994) (emphasis in original). A survival action is an action brought by the deceased's estate to recover whatever damages the deceased could have sought had he survived. <u>Id.</u>

[4]     The dissent in <u>Atlantic Sounding</u> questions the accuracy of that statement, at least in the maintenance and cure

Robertson, <u>Punitive Damages in American Maritime Law</u>, 28 J. Mar. L. & Comm. 73, 115 (1997)); <u>see also</u> <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 482-83, 490 (2008) (describing the historical availability of punitive damages in maritime law). Thus, although seamen were limited in their causes of action, they could, in exceptional circumstances, obtain relief beyond the amount needed to compensate for their injuries.[5]

So stood the state of the law for decades: seamen could recover damages if their employers failed to provide them with

---

context, stating: "[A] search for cases in which punitive damages were awarded for the willful denial of maintenance of cure — in an era when seamen were often treated with shocking callousness — yields very little." 557 U.S. at 430 (Alito, J., dissenting). But that view was in the dissent and, in any event, the majority premises its holding – discussed in depth <u>infra</u> – on the availability of punitive damages, which the dissent does not question, rather than the frequency with which they are awarded.

[5]      In noting the limits to the remedies historically available to seamen, the Court does not suggest that seamen were in any way disfavored at common law. Indeed, quite the opposite is true; seamen were "given a special status in the maritime law as the ward of the admiralty, entitled to special protection of the law not extended to land employees." <u>Seas Shipping Co. v. Sieracki</u>, 328 U.S. 85, 104 (1946) (Stone, J., dissenting). Unlike most employees, who could bring claims against their employers only under state tort law, seaman had the additional protections afforded them under general maritime law – namely, claims for maintenance and cure and for unseaworthiness. In the words of Justice Stone, seamen deserve that additional, strict-liability protection because "[t]hey are exposed to the perils of the sea and all the risks of unseaworthiness, with little opportunity to avoid those dangers or to discover and protect themselves from them or to prove who is responsible for the unseaworthiness causing the injury." <u>Id.</u>

adequate food, medical care, or a seaworthy ship (and could recover punitive damages in particularly egregious situations), but they were otherwise without a federal remedy for injuries they suffered at sea.[6] Then, in 1920, Congress enacted two landmark pieces of legislation – the Jones Act and the Death on the High Seas Act ("DOHSA") – which significantly expanded the protections available to seaman and their relatives. Atlantic Sounding, 557 U.S. at 417 (citing The Arizona v. Anelich, 298 U.S. 110, 123 (1936)). The Jones Act granted seamen a federal cause of action for employer negligence, and it allowed a seaman's personal representative to bring an action against the employer if the seaman died from his injuries. 46 U.S.C. § 30104;[7] see also Atlantic Sounding, 557 U.S. at 415. DOHSA gave a similar remedy to "survivors of all persons, seamen and non-seamen, killed on the high seas" by a wrongful act or negligence. Calhoun v. Yamaha Motor Corp., U.S.A., 40 F.3d 622, 631 (3d Cir. 1994); 46 U.S.C. § 30302.[8] Thus, with the passage of

---

[6]       Seamen did have some additional remedies under state law, but they varied from state to state and were "not designed to accommodate maritime claims." See McBride, 731 F.3d at 508 & n.4.

[7]       The relevant Jones Act provision states: "A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104.

those statutes, seamen could for the first time sue their
employers for negligence, and their survivors could pursue those
claims after their deaths. The coverage of the two statutes can
be summarized as follows:

|  | Possible Plaintiffs | Possible Defendants | Causes of Action Created | Territorial Scope |
|---|---|---|---|---|
| **Jones Act** | Seamen injured or killed in the course of employment, or their personal representatives | The seaman's employer | Negligence (can be brought as survival action); wrongful death | No territorial limit, but injury must be in course of employment |
| **DOHSA** | Personal representative of any individual killed | Person or vessel responsible for death | Negligence (brought as survival action); wrongful death | Death must have occurred on the high seas (beyond 3 miles from shore) |

Both DOHSA and the Jones Act also included provisions
addressing the types of recovery available under those new
causes of action. Under DOHSA, a plaintiff can recover "fair
compensation for the pecuniary loss sustained by the individuals
for whose benefit the action is brought." 46 U.S.C. § 30303. The
Jones Act is less specific, and it defines the available
recovery by reference to the remedies available to the employees

---

[8]      Specifically, DOHSA states: "When the death of an
individual is caused by wrongful act, neglect, or default
occurring on the high seas beyond 3 nautical miles from the
shore of the United States, the personal representative of the
decedent may bring a civil action in admiralty against the
person or vessel responsible. The action shall be for the
exclusive benefit of the decedent's spouse, parent, child, or
dependent relative." 46 U.S.C. § 30302.

of interstate railway carriers under the Federal Employers'
Liability Act ("FELA").[9] 46 U.S.C. § 30104; Miles, 498 U.S. at
32. FELA also lacks a precise definition of the available
damages, but it has "been interpreted as providing recovery only
for pecuniary loss." Miles, 498 U.S. at 32 (citing Mich. Cent.
R.R. Co. v. Vreeland, 227 U.S. 59, 69-71 (1913)). Because that
interpretation was well established when the Jones Act was
passed, the Supreme Court has concluded that "Congress must have
intended to incorporate the pecuniary limitation on damages"
into the Jones Act as well. Id. Accordingly, recovery under both
DOHSA and the Jones Act is limited to pecuniary losses, which,
generally speaking, are those that can readily be assigned a
monetary value. See Vreeland, 227 U.S. at 71 (describing a
pecuniary loss as "a material loss which is susceptible of a
pecuniary valuation," as opposed to "inestimable" losses such as
loss of society).

     As a result of the passage of those statutes, "[m]aritime
tort law is now dominated by federal statute." Miles, 498 U.S.
at 36. Nonetheless, "[t]he Jones Act evinces no general
hostility to recovery under maritime law," and it "does not
disturb seamen's general maritime claims for injuries resulting

---

[9]     In relevant part, the statute provides: "Laws of the
United States regulating recovery for personal injury to, or
death of, a railway employee apply to an action under this
section." 46 U.S.C. § 30104.

from unseaworthiness" or from failure to provide maintenance and cure. Id. at 29; see also Atlantic Sounding, 557 U.S. at 415-16 (noting that the Jones Act "did not eliminate pre-existing remedies available to seamen for the separate common-law cause of action based on a seaman's right to maintenance and cure"). Rather, the two sources of federal remedies available to seamen – federal statute and general maritime law – operate in tandem, and they provide separate yet overlapping avenues for relief.

But the two bodies of law are not seamless, and, on numerous occasions since the passage of the Jones Act, courts have been called on to address gaps or inconsistencies produced by their interaction. Two of those perceived gaps are particularly relevant here.

First, the legislative creation of wrongful death and survival actions raised the question of whether such actions should also be permissible under general maritime law. The Supreme Court partially answered that question in Moragne v. States Marine Lines, which recognized for the first time a general maritime wrongful death action. 398 U.S. at 408-09. The Court reasoned that the development of wrongful death actions under the Jones Act, DOHSA, and many state statutes "created a strong presumption in favor of a general maritime wrongful death action." Miles, 498 U.S. at 24 (describing Moragne, 398 U.S. at 391-92). The Court also noted a number of anomalies created by

13

the absence of such an action at common law. For example, a seaman's survivors had a remedy if the seaman was killed by a vessel's unseaworthiness on the high seas, where DOHSA governed, but could not recover if he was killed in territorial waters. Moragne, 398 U.S. at 395; see also id. at 395-96; Miles, 498 U.S. at 26 (describing additional anomalies). Finding nothing in the Jones Act or DOHSA that abrogated the federal courts' authority to develop nonstatutory remedies in areas where Congress has not spoken, the Court decided to eliminate those anomalies and "assure uniform vindication of federal policies" by permitting a seaman's survivors to bring a wrongful death action under general maritime law.[10] Moragne, 398 U.S. at 401.

Second, courts have considered whether the statutory limitation on available remedies – that is, the restriction to only pecuniary damages – also applies under general maritime law. The Supreme Court provided an incomplete answer to that question in Miles v. Apex Marine Corp., which considered the

_____

[10]     Although the Court said nothing about survival actions, many lower courts have concluded from that holding that survival actions based upon general maritime claims are also permissible. See, e.g., Kuntz v. Windjammer "Barefoot" Cruises, Ltd., 573 F. Supp. 1277, 1286 (W.D. Pa. 1983) ("Permitting the joinder of a survival action under general maritime law with a DOHSA claim not only fills a gap left by Congress but, additionally, it promotes the rationale behind the Moragne decision . . . ."). Nonetheless, as discussed infra, the Supreme Court has not yet formally recognized the existence of a survival action under general maritime law. See Dooley v. Korean Air Lines Co., 524 U.S. 116, 124 & n.2 (1998).

14

scope of damages recoverable by a seaman's survivors under the
maritime wrongful death action created in Moragne. 498 U.S. at
30. Noting that the Jones Act does not permit recovery for loss
of society (a non-pecuniary loss) in a wrongful death action,
the Court held that such a remedy is also barred in a general
maritime action for the wrongful death of a seaman. Id. at 33.
The Court reasoned that Congress has legislated extensively
regarding the remedies available to seamen, and "an admiralty
court should look primarily to these legislative enactments for
policy guidance." Id. at 27. The Court reiterated Moragne's
instruction that courts can use general maritime law to
supplement statutory remedies "where doing so would achieve the
uniform vindication of such policies," but they "must also keep
strictly within the limits imposed by Congress." Id. Stating
that "[i]t would be inconsistent with our place in the
constitutional scheme were we to sanction more expansive
remedies in a judicially created cause of action in which
liability is without fault than Congress has allowed in cases of
death resulting from negligence," the Court concluded that the
Jones Act's bar on recovery for loss of society must also apply
in a general maritime wrongful death action. Id. at 32-33. In
doing so, the Court declared that it was "restor[ing] a uniform
rule applicable to all actions for the wrongful death of a

seaman, whether under DOHSA, the Jones Act, or general maritime law."[11] Id. at 33.

Although Miles specifically addressed the availability of loss of society damages in wrongful death actions, lower courts began to extend "the general principle appearing to underlie its analysis – that if a category of damages is unavailable under a maritime cause of action established by statute, it is similarly unavailable for a parallel claim brought under general maritime law," to cover other forms of damages, including punitive damages. McBride, 731 F.3d at 511 (citing cases). Reasoning that punitive damages are non-pecuniary, and thus are impermissible under the Jones Act, many courts concluded that the "Miles uniformity principle" prevents recovery of punitive damages under general maritime law in both wrongful death actions and actions brought directly by injured seamen. Id. at 511-12. Based on that logic, some commentators predicted "the disappearance of punitive damages from the entire body of maritime law." Id. at

---

[11]     Miles also considered whether, in a general maritime survival action, the estate of a seaman "can recover decedent's lost future earnings." 498 U.S. at 33. That component of the decision is discussed in more depth infra, see Section III.A.3, but, put simply, the Court held that lost future earnings were unavailable in survival actions for two reasons: (1) such recovery would "be duplicative of recovery by dependents for loss of support in a wrongful death action"; and (2) a seaman's estate "cannot recover for [the seaman's] lost future income under the Jones Act." Miles, 498 U.S. at 35-36.

512 (quoting Robertson, Punitive Damages in American Maritime Law, at 154).

That view was called into question, however, by the Supreme Court's decision in Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008). Baker addressed the damages available in maritime law to commercial fisherman, Native Alaskans, and landowners injured by the Exxon Valdez oil spill. Baker, 554 U.S. at 481. The Court concluded that the Clean Water Act did not preempt maritime common law regarding punitive damages, id. at 486, and then considered whether the jury's award of punitive damages was excessive, id. at 490. As discussed in more depth below, the Court imposed a limit of a 1:1 ratio of punitive to compensatory damages in certain maritime cases. Id. at 513. Although Baker did not involve claims by seamen, and thus did not implicate the Jones Act or the Miles decision, the Court's approval of a punitive damages award under general maritime law for fisherman and landowners suggested that seamen might also still have such a remedy, as "it is hard to fathom how seamen, who by long tradition are admiralty's most favored litigants, could somehow be worse off under federal maritime law than fishermen and landowners." See David W. Robertson, Punitive Damages in U.S. Maritime Law: Miles, Baker, and Townsend, 70 La. L. Rev. 463, 477 (Winter 2010) (footnote omitted).

Then, in 2009, the Supreme Court decided <u>Atlantic Sounding</u>. In that case, the Court considered whether a seaman can recover punitive damages on a general maritime claim for maintenance and cure, and it answered that question in the affirmative. 557 U.S. at 407. The Court reasoned that punitive damages were historically available for claims arising under federal maritime law, including in the maintenance and cure context. <u>Id.</u> at 411-12. It then considered whether "Congress has enacted legislation departing from this common-law understanding." <u>Id.</u> at 415. The Court concluded that Congress had not, explaining that the Jones Act "did not eliminate pre-existing remedies available to seaman," and that the Act has consistently been recognized as remedial legislation intended to enlarge the protections available to seamen, not to narrow them. <u>Id.</u> at 415-17.

In reaching that conclusion, the Court also considered the implications of its earlier decision in <u>Miles</u>. Emphasizing that "[t]he reasoning of <u>Miles</u> remains sound," the Court explained that <u>Miles</u> barred the creation of <u>new</u> "common-law remedies that exceeded those remedies statutorily available under the Jones Act and DOHSA." <u>Id.</u> at 420. Specifically, <u>Miles</u> limited the remedies available in a seaman's wrongful death action – a type of action created by the Jones Act and extended to general maritime claims by <u>Moragne</u>. The Court observed that,

18

"unlike wrongful-death actions," the remedies available to a seaman in actions for maintenance and cure "is not a matter to which Congress has directly spoken." Id. at 420-21 (internal quotation marks omitted). Based on that distinction, the Court concluded that "Miles does not require us to eliminate the general maritime remedy of punitive damages for the willful or wanton failure to comply with the duty to pay maintenance and cure." Id. at 422; see also id. at 424-25 ("Limiting recovery for maintenance and cure to whatever is permitted by the Jones Act would give greater pre-emptive effect to the Act than is required by its text, Miles, or any of this Court's other decisions interpreting the statute."). Thus, the Court cabined the application of the "Miles uniformity principle," emphasizing that "[t]he laudable quest for uniformity in admiralty does not require the narrowing of available damages to the lowest common denominator approved by Congress for distinct causes of action." Id. at 424.

Based on the holding in Atlantic Sounding, it is now settled that a seaman can recover punitive damages in an action based upon the doctrine of maintenance and cure. It is also clear that, as a general matter, federal courts retain authority to develop and expand upon general maritime law principles, but their authority is limited in areas where Congress has directly spoken. More precisely, courts cannot create new maritime

remedies that exceed those approved by Congress in the Jones Act and DOHSA. But, at the same time, courts should be careful not to eliminate preexisting remedies in the name of uniformity, as those statutes were intended to expand, not to narrow, the protections available to seamen.

These cases require the Court to apply those principles to two questions left unresolved by <u>Miles</u> and <u>Atlantic Sounding</u>. First, the Court must decide whether an injured seaman can recover punitive damages in an action based upon the doctrine of unseaworthiness. If so, the Court must then consider whether a seaman's personal representative can recover those damages in an unseaworthiness survival action. Both of those questions appear to be issues of first impression in this circuit.[12]

---

[12]    Some commentators also consider the question of whether punitive damages should be considered "pecuniary" to be left unresolved after <u>Atlantic Sounding</u>. <u>See, e.g.</u>, David W. Robertson, <u>Punitive Damages in U.S. Maritime Law: Miles, Baker, and Townsend</u>, 70 La. L. Rev. 463, 473-74 (Winter 2010). Those commentators contend that, because punitive damages are "awarded as money," "can be estimated," and are considered to be "measured retribution," they "can sensibly be called pecuniary." <u>Id.</u> Plaintiffs here do not make that argument, however, instead implicitly conceding that punitive damages are non-pecuniary in nature. Furthermore, this Court has previously held that punitive damages are unavailable under statutes that limit recovery to pecuniary remedies. <u>See</u> <u>McCullom v. Allen-Bradley Co.</u>, No. 10-1742, 2011 WL 6026605, at *1 n.1 (E.D. Pa. 2011) (Robreno, J.). That conclusion makes sense, as punitive damages are not compensating for some specific, measurable loss, but instead are "imposed for purposes of retribution and deterrence." <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 416 (2003). The Court therefore sees no reason to

2.   <u>Punitive Damages in Unseaworthiness Claims</u>

Plaintiffs contend that, under a straightforward application of the reasoning espoused in <u>Atlantic Sounding</u>, punitive damages are "available for the willful and wanton disregard of the obligation to provide a reasonably seaworthy ship." Pls.' Resp. 7. They say that the <u>Atlantic Sounding</u> decision corrected the "erroneous course" that some courts had taken after <u>Miles</u>, <u>id.</u> at 6, and replaced it with a three-part test for evaluating whether a particular remedy is available in maritime law, <u>id.</u> at 1-2. That test, they say, requires courts to evaluate (1) whether the cause of action at issue "was well established prior to the passage of the Jones Act;" (2) whether the requested remedy was available "in general maritime law prior to the passage of the Jones Act;" and (3) whether the Jones Act or any other federal statute has addressed or limited the availability of that relief. <u>Id.</u> Applying that test, they say that unseaworthiness claims, like claims for maintenance and cure, predate the Jones Act, historically permitted punitive damages awards, and have not been limited by Congress. Thus, according to Plaintiffs, punitive damages are "logically

---

disturb its previous conclusion that punitive damages are a non-pecuniary remedy.

available" in general maritime claims for unseaworthiness as well. Id. at 7.

Defendants do not dispute that unseaworthiness claims predate the Jones Act, nor do they contend that punitive damages were historically unavailable for such claims.[13] Instead, they

---

[13]    At oral argument, counsel for Defendant National Bulk Carriers, Inc., questioned whether punitive damages were ever actually awarded in an unseaworthiness action by a seaman against his shipowner employer prior to the passage of the Jones Act. See Tr. Oral Arg., June 25, 2014, at 23, 70. Counsel noted that the Supreme Court's decision in The Amiable Nancy, which is often cited to demonstrate that punitive damages were available to seamen at common law, did not actually involve a punitive damages award to an employee-seaman in a case against an employer-shipowner. See Tr. Oral Arg. 23-24; see also The Amiable Nancy, 3 Wheat. 546 (1818). While that statement is true, it is beside the point. Although punitive damages may have been seldom actually awarded to seamen, that fact does not suggest that punitive damages were unavailable as a matter of law. Defense counsel was unable to point to any authority for the proposition that punitive damages were off-limits to seamen bringing claims for unseaworthiness before the passage of the Jones Act. See Tr. Oral Arg. 70-71.

Furthermore, the Supreme Court has already spoken on this issue, concluding – based in part upon The Amiable Nancy – that "[t]he general rule that punitive damages were available at common law extended to claims arising under federal maritime law." Atlantic Sounding, 557 U.S. at 411. In that case, the dissent made a similar argument to the one raised by defense counsel here, suggesting that there was no evidence that punitive damages had actually been awarded in early cases involving claims of maintenance and cure. See id. at 430 ("[A] search for cases in which punitive damages were awarded for the willful denial of maintenance and cure – in an era when seamen were often treated with shocking callousness – yields very little."). The majority did not disagree with that assessment, responding simply that "the general common-law rule made punitive damages available in maritime actions," and there was no indication as to "why maintenance and cure actions should be excepted from this general rule." Id. at 415 n.4. The same is

attempt to distinguish unseaworthiness claims from claims for maintenance and cure, and thus suggest that the holding of Atlantic Sounding should not be extended to include claims for unseaworthiness. Specifically, they argue that (1) because unseaworthiness is a strict liability claim that imposes damages regardless of fault, it is incompatible with punitive damages; and (2) unseaworthiness is a form of tort liability that, unlike claims for maintenance and cure, overlaps substantially with claims under the Jones Act. See Defs.' Memo. Supp. Mot. J. Pleadings 3, 5-7. Based on those distinctions, they contend that the holding of Miles, not Atlantic Sounding, controls the outcome here.

Plaintiffs have the better argument. As Atlantic Sounding makes clear, forms of relief that were historically available under general maritime law should not be eliminated in the name of uniformity absent a Congressional statement to the contrary. Although Atlantic Sounding's holding is limited to claims for maintenance and cure, its reasoning encompasses unseaworthiness

---

true here – no party has pointed to any evidence that unseaworthiness claims were not included in the general common law rule. Punitive damages therefore appear to have been at least theoretically available in claims for unseaworthiness prior to the passage of the Jones Act, which is all that the Supreme Court considers relevant.

claims as well.[14] The opinion expressly states that "punitive damages have long been available at common law," and "the common-law tradition of punitive damages extends to maritime claims." <u>Atlantic Sounding</u>, 557 U.S. at 414. It further concludes that the Jones Act preserved common law causes of action, as the Act was intended to be remedial legislation that expanded the protections available to seamen, "not an exclusive remedy" that replaced the existing forms of relief. <u>Id.</u> at 416. Both of those conclusions apply with equal force to claims for unseaworthiness and for maintenance and cure, as both causes of action are general maritime claims that predate the Jones Act. <u>See</u> <u>Cortes</u>, 287 U.S. at 370-71 (describing the relief available to seamen at common law).

---

[14]     As a lower court, this Court is "bound by both the Supreme Court's choice of legal standard or test and by the result it reaches under that standard or test." <u>Planned Parenthood of Se. Pa. v. Casey</u>, 947 F.2d 682, 692 (3d Cir. 1991), <u>aff'd in part, rev'd in part</u>, 505 U.S. 833 (1992). As this Court has previously explained, "[i]f the rule were otherwise, the Supreme Court's 'limited docket' would limit the Court's authority only to the 'handful of cases that reached it.'" <u>Donn v. A.W. Chesterton Co.</u>, 842 F. Supp. 2d 803, 809 n.5 (E.D. Pa. 2012) (Robreno, J) (quoting <u>United States v. Powell</u>, 109 F. Supp. 2d 381, 384 (E.D. Pa. 2000)). Accordingly, the Court must adhere "to both the reasoning and result" of <u>Atlantic Sounding</u>, "and not simply to the result alone." <u>See</u> <u>Planned Parenthood</u>, 947 F.2d at 692; <u>see also</u> <u>Loftus v. Se. Pa. Transp. Auth.</u>, 843 F. Supp. 981, 984 (E.D. Pa. 1994) (Robreno, J.) ("The Court is obliged to follow both the <u>result</u> reached by the Supreme Court . . . as well as the <u>rule</u> used in arriving at the result . . . .") (emphasis in original).

Furthermore, the distinctions drawn by Defendants do not compel a different result. Although it is true that unseaworthiness is a species of strict liability, and thus a shipowner can be held liable for harm caused by an unseaworthy vessel "irrespective of fault," Miles, 498 U.S. at 25, the state of mind necessary to incur primary liability is a separate inquiry from the culpability necessary to impose punitive damages. As discussed in more depth below, "punitive damages recovery always requires a finding of willful and wanton conduct, whether the cause of action is for maintenance and cure or unseaworthiness." McBride, 731 F. 3d at 517. In other words, punitive damages can never be imposed without regard to fault, even if the underlying cause of action is a strict liability claim. In cases where a seaman was injured by an unseaworthy ship but cannot show any fault on the part of the shipowner, he of course cannot recover punitive damages. But it does not follow that a seaman who establishes willful and wanton conduct should be similarly limited in his recovery.[15] Cf. Jackson v.

---

[15]     For the same reason, Miles's warning against allowing "more expansive remedies in a judicially created cause of action in which liability is without fault" than those permitted under the Jones Act is not implicated here. 498 U.S. at 32. The Miles Court was concerned that the remedies available on a strict liability claim not be broader than those available in a negligence claim. But, whether the underlying claim is a strict liability claim or not, punitive damages are available only when the defendant has engaged in grossly negligent, reckless, or intentional conduct. See Baker, 554 U.S. at 493. Therefore, only

Johns-Manville Sales Corp., 781 F.2d 394, 399-401 (5th Cir.
1986) (rejecting the argument that punitive damages are
unavailable in cases of strict liability).

　　　　The second distinction Defendants raise – that
unseaworthiness claims are more directly affected by the Jones
Act than claims for maintenance and cure – has more theoretical
appeal. Defendants characterize maintenance and cure as a
"quasi-contractual" claim, whereas they portray unseaworthiness
as a type of personal injury tort claim. Defs.' Mem. Supp. Mot.
J. Pleadings 7. Relying on that characterization, they contend
that Congress addressed the damages recoverable for
unseaworthiness through the passage of the Jones Act, which
defined the recovery "for personal injury or death of a seaman."
Id. Put another way, Defendants suggest that unseaworthiness
claims have more in common with Jones Act claims than they do
with claims for maintenance and cure, which stand apart as a
"quasi-contractual" remedy. Thus, because punitive damages are
not available under the Jones Act, Defendants contend that the
long-standing uniformity principle described in Miles requires
that punitive damages be similarly unavailable in
unseaworthiness claims. Id. at 7-8; see also Defs.' Reply Br. 3-
4, ECF No. 4151 (citing Mobile Oil Corp. v. Higginbotham, 436

---

if a defendant has been shown to be at fault can punitive
damages be imposed.

U.S. 618 (1978), for the principle that "[c]ourts may not award damages under general maritime law . . . that go beyond the limits established by an [applicable federal] statute"). In further support of that theory, they note that Miles itself involved a claim based upon unseaworthiness.

Closely analyzed, however, that argument has several significant problems. First, claims for unseaworthiness and for maintenance and cure are not as cleanly distinguishable as Defendants suggest. Although it is true that maintenance and cure has been described as "quasi-contractual," see, e.g., Atlantic Sounding, 557 U.S. at 432 (Alito, J., dissenting), unseaworthiness claims also have a contractual component, as they arise from the master's duty to provide his servants with a seaworthy ship. As with the duty to provide an injured seaman with food and medical care, that duty is firmly anchored in the master/servant relationship, and it is imposed without regard to fault. Those features give unseaworthiness claims their own quasi-contractual features, and distinguish them from claims under the Jones Act. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 92-93 (1946) (explaining that "the liability for unseaworthiness is often said to be an incident of the seaman's contract," and noting that courts have grounded the doctrine in the employment relationship in order to avoid the improper importation of tort law principles into unseaworthiness cases).

27

Conversely, despite having a contractual component, many claims for maintenance and cure could also be labeled "personal injury tort claims." As the Supreme Court explained long ago in <u>Cortes</u>, "[t]here is little doubt" that a seaman whose health is permanently impaired due to a violation of the duty of maintenance and cure "would be said to have suffered a personal injury." 287 U.S. at 373. In such situations, a seaman's general maritime claim for maintenance and cure might overlap with a Jones Act negligence claim. <u>Id.</u> Thus, although it may be true "that unseaworthiness claims are more closely related to negligence claims than they are to maintenance and cure claims," <u>McBride</u>, 731 F.3d at 515, the differences are more nice than bright, and all three claims have features in common.

Second, it is well established that, notwithstanding the substantive overlap between general maritime claims and claims under the Jones Act, a seaman is permitted to seek remedies under both sources of law. As <u>Atlantic Sounding</u> itself explains when rejecting the notion that the Jones Act limits the remedies for maintenance and cure, a seaman has a "right to choose among overlapping statutory and common-law remedies." 557 U.S. at 423 (citing <u>Cortes</u>, 287 U.S. at 374-75). That right is evident in the language of the Jones Act, which allows a seaman to "elect" to bring a Jones Act claim, suggesting "a choice of actions for seamen." <u>Id.</u> at 416. The <u>Atlantic Sounding</u> decision further

28

emphasizes that, despite their substantive overlap, "remedies for negligence, unseaworthiness, and maintenance and cure have different origins and may on occasion call for application of slightly different principles and procedures." Id. (quoting Fitzgerald v. United States Lines Co., 374 U.S. 16, 18 (1963)). All of those statements suggest that the substantive overlap between the doctrine of unseaworthiness and the Jones Act should not be interpreted as limiting the remedies available under general maritime law.

Finally, in focusing on the substantive relationship among the various causes of action available to seamen, Defendants overlook the key inquiry identified in Atlantic Sounding: whether it is "possible to adhere to the traditional understanding of maritime actions and remedies without abridging or violating the Jones Act." Id. at 420. As with claims for maintenance and cure, the Jones Act does not directly address unseaworthiness or its available remedies. See id. It is therefore feasible for courts to allow punitive damages in unseaworthiness actions, as they did at common law, without violating the Jones Act.

That conclusion is fully compatible with the Supreme Court's earlier decision in Miles. While it is true that Miles involved a claim of unseaworthiness, that claim was brought as part of a wrongful death action – a type of action in maritime

29

law that Congress created for the first time with the passage of the Jones Act. _Miles_, 498 U.S. at 31. Because Congress had legislated regarding the remedies available in wrongful death actions, the _Miles_ Court concluded that it was not free to expand upon those remedies. _Id._ at 32. _Atlantic Sounding_, on the other hand, did not involve a wrongful death action; the plaintiff seaman was injured, but not killed, after falling on board his vessel. 557 U.S. at 407. The _Atlantic Sounding_ Court based its holding on that distinction, explaining that "unlike wrongful-death actions," the traditional understanding of maritime actions and remedies "is not a matter to which Congress has spoken directly." _Id._ at 420-21 (quoting _Miles_, 498 U.S. at 31) (internal quotation marks omitted). Thus, the relevant distinguishing feature between the two cases is that _Miles_ was a wrongful death action, not that it involved an unseaworthiness claim.[16]

---

[16]     The _Atlantic Sounding_ decision created some confusion in this regard by stating that, "[u]nlike the situation presented in _Miles_," in _Atlantic Sounding_ "both the general maritime cause of action (maintenance and cure) and the remedy (punitive damages) were well established before the passage of the Jones Act." 557 U.S. at 420. That statement is somewhat misleading, because the situation in _Miles_ also involved a cause of action that predated the Jones Act – namely, unseaworthiness. _See Miles_, 498 U.S. at 21. But as _Atlantic Sounding_ went on to explain, the distinguishing feature between the two cases is not the _cause_ of action, but rather is the _type_ of action; _Miles_ involved a wrongful death action. Technically speaking, a wrongful death action is a type of judicial proceeding, whereas the term "cause of action" refers to the "facts which give a

For all of the foregoing reasons, the Court concludes that punitive damages may – in some situations – be awarded in a general maritime claim of unseaworthiness.[17] As was true before

person a right to judicial redress or relief against another." Black's Law Dictionary 221 (6th ed. 1990). The Supreme Court seems to have perhaps briefly conflated those terms in Atlantic Sounding, but the Court's reasoning, when read in its entirety, is quite clear.

[17]      That conclusion has been endorsed by several other district courts that have faced the issue, as well as the only court of appeals that has yet to confront it. See McBride, 731 F.3d at 518; Rowe v. Hornblower Fleet, No. 11-4979, at 23-24 (N.D. Cal. Nov. 16, 2012) (slip opinion); In re Osage Marine Serv., Inc., No. 10-1674, 2012 WL 709188, at *3 (E.D. Mo. Mar. 5, 2012); Barrette v. Jubilee Fisheries, Inc., No. 10-1206, at 12 (W.D. Wash. Aug. 11, 2011) (slip opinion).

In McBride, the Fifth Circuit held that "punitive damages remain available to seamen as a remedy for the general maritime law claim of unseaworthiness," reasoning that "unseaworthiness was established as a general maritime claim before the passage of the Jones Act, punitive damages were available under general maritime law, and the Jones Act does not address unseaworthiness or limit its remedies." 731 F.3d at 518. In doing so, McBride overruled the two district court cases relied upon by Defendants. See Defs.' Mem. Supp. Mot. J. Pleadings 6-7 (citing Wilson v. Noble Drilling Corp., No. 08-4940, 2009 WL 9139586 (E.D. La. Aug. 12, 2009); McBride v. Estis Well Serv., LLC, 872 F. Supp. 2d 511 (W.D. La. 2012)).

McBride, however, does not distinguish between unseaworthiness claims brought directly by an injured seaman and those brought in wrongful death and survival actions. As discussed infra, the Court finds that distinction important, and concludes that punitive damages are not permitted in wrongful death and survival actions. McBride's holding is therefore broader than the one adopted here, and it is arguably in conflict with Miles, which held that the damages available in a wrongful death action based upon unseaworthiness are limited to those permitted under the Jones Act. See Miles, 498 U.S. at 33. On February 24, 2014, the Fifth Circuit granted rehearing en banc in McBride. McBride v. Estis Well Serv., L.L.C., 743 F.3d 458 (5th Cir. 2014).

the passage of the Jones Act, a seaman can pursue an unseaworthiness claim under general maritime law and, when appropriate, be awarded punitive damages.

### 3. Survival Actions

The conclusion that punitive damages are permitted in unseaworthiness claims does not, however, mean that they are available in every type of maritime action in which such claims are brought. As discussed above, the <u>Atlantic Sounding</u> Court was quite clear that wrongful death actions are an entirely different matter, as they do not predate the Jones Act. Under the holding in <u>Miles</u>, which was expressly reaffirmed in <u>Atlantic Sounding</u>, the remedies available in wrongful death actions are limited to those available under the Jones Act. Thus, Plaintiffs do not dispute that wrongful death actions under maritime law cannot support punitive damages awards, even if those actions are based upon general maritime claims for unseaworthiness.

Nonetheless, Plaintiffs contend that punitive damages are recoverable in a general maritime law <u>survival</u> action. Although they acknowledge "that seamen had no survival or wrongful death actions against their employers prior to the Jones Act," they say that the Court should not focus on that timing. Pls.' Resp. 8. Instead, they argue that the proper inquiry is whether the underlying theory of liability – that is, the general maritime

32

doctrine of unseaworthiness – predates the Jones Act. By viewing the inquiry in that fashion, Plaintiffs argue that the estate of a seaman who dies as a result of injuries incurred due to the unseaworthiness of his vessel should not be barred from recovering damages to which the seaman was entitled during his life. Id. In other words, they suggest that it would be anomalous for an injured seaman to be able to recover punitive damages, yet for the estate of a seaman who is killed to be unable to do so.

But while it may seem anomalous, that is the result required by Supreme Court precedent. Atlantic Sounding grounded its holding in the chronology of the development of maritime law, concluding that punitive damages are available in maintenance and cure claims because they had been available prior to the passage of the Jones Act. See 557 U.S. at 414-15. Indeed, Plaintiffs rely heavily on that reasoning to support their contention that unseaworthiness claims can support punitive damages awards. Yet, by Plaintiffs' own admission, survival actions do not predate the Jones Act. In fact, the Supreme Court has yet to officially recognize the existence of a survival action under general maritime law. See Dooley v. Korean Air Lines Co., 524 U.S. 116, 124 & n.2 (1998) (declining to "decide whether general maritime law ever provides a survival action"). Thus, the reasoning of Atlantic Sounding does not

33

support Plaintiffs' contention that survival actions allow broader remedies than those available under the Jones Act.

The reasoning of <u>Miles</u>, on the other hand, is directly on point. <u>Miles</u> explained that admiralty courts may use general maritime law to supplement statutory remedies, but they must "keep strictly within the limits imposed by Congress." 498 U.S. at 27. Because "there is no survival of unseaworthiness claims absent a change in the traditional maritime rule," any judicial sanction of such a survival action represents an expansion of the general maritime law that must conform to the remedies condoned by Congress. <u>Id.</u> at 34. As the <u>Miles</u> Court expressly stated: "Congress has placed limits on recovery in survival actions that we cannot exceed. Because this case involves the death of a seaman, we must look to the Jones Act." <u>Id.</u> at 36. The Jones Act does not permit recovery of punitive damages, and thus punitive damages are not permissible in a general maritime survival action. <u>See</u> <u>Hackensmith v. Port City Steamship Holding Co.</u>, 938 F. Supp. 2d 824, 829 (E.D. Wisc. 2013) (concluding that, even after <u>Atlantic Sounding</u>, "<u>Miles</u> still operates to bar punitive and other non-pecuniary damages in general maritime wrongful death claims").

Finally, to the extent that it would be anomalous to permit punitive damages when a seaman is injured but not when one is killed, that anomaly existed at common law. As the

Supreme Court explained in Cortes, a remedy for a seaman's injury "ends with his death in the absence of a statute continuing it or giving it to another for the use of wife or kin." 287 U.S. at 371. No statute has extended the availability of punitive damages beyond a seaman's lifetime; rather, the statutes creating survival and wrongful death actions limited the available recovery to pecuniary damages. Therefore, however unfair or anomalous, the common law discrepancy in available remedies persists in the area of punitive damages.

### 4. Reconciling General Maritime Law with Statutory Enactments

In sum, a general maritime claim of unseaworthiness can support a punitive damages award when brought directly by an injured seaman, but not when brought by a seaman's personal representative as part of a wrongful death or survival action. Put simply, the remedy of punitive damages exists as it did prior to the passage of the Jones Act, and thus does not survive a seaman's death. Defendants' motions for judgment on the pleadings regarding punitive damages will therefore be granted as to all Plaintiffs seeking punitive damages in wrongful death or survival actions.

B. <u>Punitive Damages in Asbestos Cases</u>

Having concluded that maritime law does not impose a general bar on punitive damages in unseaworthiness claims, the Court turns to the question of whether punitive damages are appropriate when such claims arise in the context of asbestos cases. This issue underpins the availability of punitive damages and necessarily must be addressed in this context.[18]

Although various rationales have historically been used to justify punitive damages awards, the consensus today is that punitive damages are not intended to compensate the plaintiff for a loss suffered, but instead are "imposed for purposes of retribution and deterrence." <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 416 (2003) (quoting <u>Pac. Mut. Life Ins. Co. v. Haslip</u>, 499 U.S. 1, 19 (1991); <u>see also</u> Restatement (Second) of Torts § 908(1) (providing that punitive damages may be "awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future"). Courts also generally limit punitive damages to cases "where a defendant's conduct is 'outrageous,' owing to 'gross negligence,' 'willful, wanton, and reckless indifference for the rights of others,' or behavior even more

---

[18]    The issue of the availability of punitive damages in asbestos-related cases was specifically raised by the Court at oral argument. <u>See</u> Tr. Oral Arg., June 25, 2014, at 54.

36

deplorable." Baker, 554 U.S. at 493 (citations omitted). Put simply, punitive damages are aimed at punishing and deterring particularly egregious conduct.

Some judges and commentators have suggested that those rationales do not apply in the context of today's asbestos litigation. They note that there is little conduct left to deter in that area, as the Occupational Safety and Health Administration ("OSHA") began regulating occupational exposure to asbestos in 1971, and – although not banned outright in all products – asbestos use is now tightly regulated. See Dunn v. HOVIC, 1 F.3d 1371, 1396, 1403 (3d Cir. 1993) (en banc) (Weis, J., dissenting); Mark A. Behrens & Cary Silverman, Punitive Damages in Asbestos Personal Injury Litigation: The Basis for Deferral Remains Sound, 8 Rutgers J. L. & Pub. Pol'y 50, 63 (Fall 2010) [hereinafter, "Basis for Deferral"]; U.S. Envtl. Prot. Agency, U.S. Federal Bans on Asbestos (2014), available at www2.epa.gov/asbestos/us-federal-bans-asbestos#regulatory (last visited July 2, 2014). Moreover, asbestos litigation has since ballooned to enormous proportions, prompting dozens of companies to declare bankruptcy. See Victor E. Schwartz, A Letter to the Nation's Trial Judges: Asbestos Litigation, Major Progress Made Over the Past Decade and Hurdles You Can Vault in the Next, 36 Am. J. Trial Advoc. 1, 5 (Summer 2012) [hereinafter, "Letter to Trial Judges"] ("By the end of 2011, at least ninety-six

37

companies with asbestos-related liabilities had declared
bankruptcy."). Critics of punitive damages say that, because of
those numerous and high-profile bankruptcies, the "message of
deterrence, both specific and general, has been heard loud and
clear," obviating the deterrent effect of a punitive damages
award. Behrens, Basis for Deferral, 8 Rutgers J. L. & Pub. Pol'y
at 68-69.

As for the retributive function of punitive damages, some
scholars suggest that the significant time lapse between the
relevant conduct and the current litigation undermines the need
for retribution. For most, if not all, companies involved in
asbestos litigation, "the economic players today are quite
different from those who made the risk decisions decades ago at
the time of exposure." W. Kip Viscusi, Why There Is No Defense
of Punitive Damages, 87 Geo. L.J. 381, 383 (Nov. 1998)
[hereinafter, "No Defense"]. For that reason, "[p]unitive awards
in asbestos cases usually do not punish the individuals who were
responsible for the offensive conduct," Dunn, 1 F.3d at 1403
(Weis, J., dissenting), but instead "inflict harm on current
shareholders, customers, and employees" of the defendant
corporation, Viscusi, No Defense, 87 Geo. L.J. at 383. See also
Schwartz, Letter to Trial Judges, 36 Am. J. Trial Advoc. at 5.
Some commentators therefore conclude that punitive damages
awards serve neither of their intended functions in the asbestos

context, and so "use of that weapon is no longer justified."
Dunn, 1 F.3d at 1396 (Weis, J., dissenting).

In addition to challenging the overarching rationales
behind punitive damages, some commentators add that punitive
damages are unlikely to be appropriate in most current asbestos
cases. The factors relevant to an assessment of punitive damages
include, among other things: "(1) the act itself, including the
motives of the wrongdoer, the relations between the parties, and
provocation or want of provocation; (2) the extent of harm to
the injured person, including the expense to which plaintiff has
been put in bringing a lawsuit; (3) the wealth of the defendant;
and (4) the existence of multiple claims." Dunn, 1 F.3d at 1380
n.12 (citing Restatement (Second) of Torts § 908 cmt. e).
Critics of punitive damages contend that, in most asbestos
cases, those factors caution against awarding punitive damages.
They offer a variety of reasons supporting that proposition,
including that today's defendants are often peripheral players
who neither manufactured or distributed asbestos and were
unaware of its dangers, that enormous litigation spending has
already ensured that injury costs are fully internalized by
defendants, and that punitive damages awards deplete available
funds and thus penalize future claimants. See, e.g., id. at
1398-1402; Schwartz, Letter to Trial Judges, 36 Am. J. Trial
Advoc. at 32; Behrens, Basis for Deferral, 8 Rutgers J. L. &

39

Pub. Pol'y at 63-69; see also In re Collins, 233 F.3d 809, 812 (3d Cir. 2000) (noting that "[t]he resources available to persons injured by asbestos are steadily being depleted"). For all of those reasons, these critics suggest that the public is generally ill-served by punitive damages awards in asbestos cases.

Finally, critics of punitive damages further note that asbestos cases, like many mass tort cases, pose the "multiple punishments problem." First identified in the 1960s by Judge Henry Friendly, the "multiple punishments problem" arises when "a defendant, who has injured multiple potential plaintiffs by a single act or course of conduct, faces multiple punitive damages awards for that conduct." Jim Gash, Solving the Multiple Punishments Problem: A Call for a National Punitive Damages Registry, 99 Nw. U. L. Rev. 1613, 1613-14 (Summer 2005) [hereinafter, "Multiple Punishments"]. In such a situation, there is a risk that the defendant will be repeatedly punished for the same conduct, which could result in a punishment "so irrational as to offend the due process clause of the Fourteenth Amendment." Dunn, 1 F.3d at 1405 (Becker, J., dissenting); see also State Farm, 538 U.S. at 423 (expressing concern about "the possibility of multiple punitive damages awards for the same conduct"); Gash, Multiple Punishments, 99 Nw. U. L. Rev. at 1614, 1627-34. In light of that concern, several courts –

including the Third Circuit – have indicated that a successive
punitive damages award would be improper if there is evidence
"that the aggregate of prior awards has reached the maximum
amount tolerable under the Due Process Clause." Dunn, 1 F.3d at
1389; see also Racich v. Celotex Corp., 887 F.2d 393, 398 (2d
Cir. 1989) ("We agree that the multiple imposition of punitive
damages for the same course of conduct may raise serious
constitutional concerns, in the absence of any limiting
principle.").

But despite the persuasiveness of many of those arguments
as a matter of public policy, they do not provide a strong
doctrinal foundation for the Court to conclude that punitive
damages are generally unavailable in asbestos cases. First of
all, the Third Circuit made clear in its en banc decision in
Dunn v. HOVIC that the multiple punishments problem is not –
standing alone – a proper basis for barring punitive damages in
all asbestos cases. Indeed, the majority in Dunn explicitly
stated that, as a general matter, "multiple punitive damages
awards are not inconsistent with the due process clause or
substantive tort law principles." 1 F.3d at 1386. The court
explained that duplicative awards can be reduced or overturned
on due process grounds only as to an individual defendant, and
only if that defendant has presented evidence "demonstrating the
amount of punitive damages it has actually paid in the past."

41

<u>Id.</u> at 1389. Other courts have responded to similar arguments
even more pointedly. For example, the Fifth Circuit held that
the "multiple punishments problem" is not a basis for denying
punitive damages in asbestos cases, emphatically rejecting the
notion that "when a defendant injures tens of thousands and
manifests reckless disregard for the victims' lives and welfare,
punitive damages should be unavailable as a matter of law."
<u>Jackson</u>, 781 F.2d at 405; <u>see also</u> <u>Cantrell v. GAF Corp.</u>, 999
F.2d 1007, 1017 (6th Cir. 1993) (expressing the view that
"relief from multiple punitive damages awards should not be
sought from a federal court . . . but, rather, from the
legislature under whose law the action is decided"). In light of
those holdings, it is not within this Court's authority to
disallow punitive damages claims overall as a matter of public
policy due solely to the <u>potential</u> for repetitive punishment.

　　　　Furthermore, many of the other critiques of punitive
damages presume certain facts that may not be present in every
case. For example, although many of the defendants in the
instant litigation may be "peripheral defendants who did not
engage in conscious, flagrant wrongdoing," it is possible that
at least some do not meet that description. <u>See</u> Schwartz, <u>Letter
to Trial Judges</u>, 36 Am. J. Trial Advoc. at 32. Similarly,
despite the overall sums spent on asbestos litigation, there may
be some defendants who are not in dire financial straits, and

thus are able to pay future compensatory damages on top of a punitive damages award. In other words, not every feature of the overall asbestos litigation is <u>necessarily</u> present in every case.

Moreover, the punitive damages standard itself prevents awards in such cases. Simply because punitive damages are theoretically available does not mean they are appropriate in any and all cases. A peripheral defendant who did not engage in flagrant wrongdoing likely has not committed the "outrageous" conduct necessary for a punitive damages award, and the wealth of the defendant and the existence of multiple claims are factors to be considered when assessing appropriate damages. Because courts are able to consider these factors in the context of individual cases, the decision regarding the overall propriety of punitive damages in asbestos cases seems more like a legislative determination based on social policy than a judicial one. <u>See</u> <u>Dunn</u>, 1 F.3d at 1389 (declining to respond to the arguments against punitive damages in mass tort cases because "we do not believe that a judicial opinion of an intermediate appellate court is the appropriate forum for a debate on the policies for and against punitive damages"); <u>see also</u> <u>Jackson</u>, 781 F.2d at 406 (concluding that a "complete bar to the availability of punitive damages as a matter of law" is a remedy "more properly granted by the state or federal

43

legislature than by this Court") (quoting <u>Cathey v. Johns-Manville Sales Corp.</u>, 776 F.2d 1565, 1569-70 (6th Cir. 1985)).

There is one critique, however, that arguably could apply in all cases – namely, that the deterrence and retribution rationales for punitive damages are not implicated in asbestos cases because of the significant time lapse since the relevant conduct. It is true that deterring the future use of asbestos is unlikely to be considered a legitimate rationale for a punitive damages award, as federal regulation has largely ensured that result. It is also true that punitive damages awarded today are unlikely to punish the correct actor, as the relevant players have changed. But there are counterarguments here as well; in particular, a punitive damages award could (at least hypothetically) deter future willful or reckless conduct regarding a <u>different</u> risky product.[19] As the Sixth Circuit has explained, "[w]hether a defendant's particular course of conduct has ceased is irrelevant to the accomplishment" of the broader

---

[19]    This scenario presumes that such deterrence has not already been achieved due to the costs of asbestos litigation. It contemplates a scenario in which a company made a conscious decision to manufacture or use asbestos despite knowing the risks it posed to employees or consumers, and that decision ultimately proved cost-effective (that is, the company's liabilities for compensatory damages have not exceeded the economic benefits obtained through the use of asbestos). Without punitive damages, it is possible that future companies would not be deterred from engaging in similar cost/benefit analyses, and thus that punitive damages in certain asbestos cases continue to serve a deterrence function.

general deterrence function of punitive damages awards. <u>Moran v. Johns-Manville Sales Corp.</u>, 691 F.2d 811, 816 (6th Cir. 1982); <u>see also</u> <u>In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.</u>, No. 04-3417, 2009 WL 3347214, at *8 (S.D.N.Y. Oct. 19, 2009) (concluding that, although New York had banned the use of MTBE and thus there was "no need to deter further reprehensible conduct specifically relating to the use of MTBE in New York," the state still had "an interest in deterring <u>similar</u>, in addition to <u>identical</u>, conduct"). The <u>Moran</u> court also rejected the argument that "innocent shareholders," rather than the culpable party, would be punished by an award of punitive damages, noting that "[p]unitive damage awards are a risk that accompanies investment." 691 F.2d at 817.

More importantly, there are virtually no cases in which a federal court barred a punitive damages award solely on the basis that – as a general matter – the rationales for punitive damages are no longer applicable in asbestos cases. <u>But see</u> <u>Sanford v. Celotex Corp.</u>, 598 F. Supp. 529, 531 (M.D. Tenn. 1984) (dismissing a punitive damages claim in an asbestos case because Tennessee recognizes only a specific deterrence function to punitive damages, which the court held would not be served due to defendant's "potential and actual exposure to millions of

dollars in compensatory damages").[20] As with the other critiques of punitive damages generally, this one has stayed firmly within the domains of academics and partisans, while courts have continued to address punitive damages claims based on the specific facts of each case. See Gash, Multiple Punishments, 99 Nw. U. L. Rev. at 1623, 1627-31 (describing courts' analyses of the policy considerations, but acknowledging that few courts have actually overturned a punitive damages award for policy reasons and virtually all have agreed that legislative action is needed in that regard).

In sum, the policy considerations cautioning against punitive damage awards in asbestos cases do not provide a basis for a judicial ruling that under maritime law punitive damages are unavailable in all such cases as a matter of law. That

---

[20]    The one circuit court to do so was later reversed in an en banc decision. In Jackson v. Johns-Manville Sales Corp., 727 F.2d 506 (1984), the Fifth Circuit held that Mississippi law "would disallow punitive damages in asbestos products liability actions," because the purposes of punitive damages were not served in that context. Hansen v. Johns-Manville Prods. Corp., 734 F.2d 1036, 1041 (5th Cir. 1984) (describing the Jackson decision). Upon rehearing en banc, the original Jackson decision was vacated, and the court certified to the Mississippi Supreme Court the question of whether "a Plaintiff whose cause of action is based upon strict liability in tort can recover punitive damages against Defendants who have been or may be subjected to multiple awards of compensatory and punitive damages for the same wrongful conduct." See Jackson, 781 F.2d at 396. After the Mississippi Supreme Court declined to consider the question, a subsequent en banc panel answered it in the affirmative, concluding that punitive damages are available "in cases of strict liability or cases of mass tort." Id. at 407.

conclusion does not, however, suggest that there is no room for
the Court to impose certain and in some cases strict limitations
as to the kind of conduct which would warrant them or the
appropriate size of punitive damage awards. Indeed, the Supreme
Court has permitted review and modification of punitive damages
awards under two federal authorities relevant here: (1) the Due
Process Clause; and (2) federal maritime law.

"The Due Process Clause of the Fourteenth Amendment
prohibits the imposition of grossly excessive or arbitrary
punishments on a tortfeasor." State Farm, 538 U.S. at 416.
Courts consider three "guideposts" when determining whether a
punitive damages award comports with due process: "(1) the
degree of reprehensibility of the defendant's misconduct; (2)
the disparity between the actual or potential harm suffered by
the plaintiff and the punitive damages award; and (3) the
difference between the punitive damages awarded by the jury and
the civil penalties authorized or imposed in comparable cases."
CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 499
F.3d 184, 189 (3d Cir. 2007) (quoting State Farm, 538 U.S. at
418)). Although the Supreme Court has "been reluctant to
identify concrete constitutional limits on the ratio between
harm, or potential harm, to the plaintiff and the punitive
damages award," it has stated that, "in practice, few awards
exceeding a single-digit ratio between punitive and compensatory

damages . . . will satisfy due process." State Farm, 538 U.S. at 424-25. Overall, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Id. at 426. In making that assessment, courts can consider the "aggregate of prior awards" that a defendant has incurred for the same course of conduct. Dunn, 1 F.3d at 1389.

Ordinarily, a court's review of a jury's punitive damages award is confined to that due process analysis. Most punitive damages claims arise under state law, and states have "considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases." BMW of N. Am. v. Gore, 517 U.S. 559, 568 (1996). "Only when an award can fairly be categorized as 'grossly excessive' in relation to [a state's legitimate] interests does it enter the zone of arbitrariness that violates" due process. Id. But when a punitive damages claim arises in a case brought under federal maritime law, rather than state substantive law, federal courts have considerably more latitude. As the Supreme Court explained in Baker, when a case "arises under federal maritime jurisdiction," the court is "reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process." 554 U.S. at 501-02. The Court further noted that in such instances the reviewing court is "examining

48

the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard." Id. at 502. Thus, the Court concluded that its review of punitive damages in maritime law "considers not their intersection with the Constitution, but the desirability of regulating them as a common law remedy for which responsibility lies with this Court as a source of judge-made law in the absence of statute."[21] Id.

Exercising its authority under federal maritime law, the Baker Court then considered whether the punitive damages award at issue was a penalty "that reasonable people would think excessive for the harm caused in the circumstances" – a considerably more flexible standard than the due process inquiry. Id. at 503. The Court noted that the particular circumstances of that case – which arose from the grounding of the Exxon Valdez oil tanker and resulting oil spill – involved

---

[21]        Responding to the dissent's argument that Congress, rather than the Court, should make policy determinations in this realm, the Baker majority further explained that "the Judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law maritime, and Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law." Baker, 554 U.S. at 508 n.21 (quoting United States v. Reliable Transfer Co., 421 U.S. 397, 409 (1975)). The Court supported that proposition by citing to its earlier decisions in Moragne and Miles, concluding that, "[w]here there is a need for a new remedial maritime rule, past precedent argues for our setting a judicially derived standard, subject of course to congressional revision." Id.

"reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury." Id. at 511. Such conduct, though worthy of condemnation, is not as blameworthy as other conduct that might also warrant punitive damages. As the Court explained, "[r]eckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it." Id. at 493. The Court further distinguished the conduct at issue from actions "taken or omitted in order to augment profit," which represent "an enhanced degree of punishable culpability," as well as from wrongdoing that is hard to detect or prosecute, which may be difficult to deter. Id. at 494. Because the conduct at issue in Baker – namely, Exxon's indifference toward the captain of the tanker's alcoholism – involved none of those "earmarks of exceptional blameworthiness within the punishable spectrum," the Supreme Court imposed a 1:1 ratio of punitive to compensatory damages as an "upper limit in such maritime cases." Id. at 513.

    Because the cases at issue here arise under maritime law, any punitive damages awards must adhere to the standards articulated in Baker. That does not necessarily mean that a 1:1 ratio is the outer limit, as Plaintiffs could conceivably demonstrate that Defendants' blameworthiness is more "exceptional" than the conduct at issue in Baker. But it does mean that the Court has greater ability to limit the type of

conduct which warrants them and the size of punitive damage awards in this context than it has under the Due Process Clause.

For the foregoing reasons, the Court concludes that punitive damages are <u>not</u> off-limits as a matter of law to seamen bringing claims of unseaworthiness in asbestos cases, but, however, may be subject to limitations under the specific circumstances of the individual cases.

C. <u>Adequacy of the Pleadings</u>

Punitive damages claims, like all allegations in a complaint, must satisfy the pleading standard under Federal Rule of Civil Procedure 12(b)(6). Pursuant to the Supreme Court's decisions in <u>Twombly</u> and <u>Iqbal</u>, Rule 12(b)(6) requires a plaintiff to plead factual content sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged. <u>See</u> <u>supra</u> Section II (citing <u>Iqbal</u>, 556 U.S. at 678; <u>Twombly</u>, 550 U.S. at 555 & n.3). To satisfy the pleadings standard, Plaintiffs' complaints must therefore contain factual allegations that, if accepted as true, state a facially plausible punitive damages claim. <u>See</u> <u>Caprio v. Healthcare Revenue Recovery Grp., LLC</u>, 709 F.3d 142, 147 (3d Cir. 2013).

As discussed above, punitive damages under general maritime law are appropriate only in situations where a

defendant's conduct can be characterized as "outrageous" due to
the exercise of "gross negligence, willful, wanton, and reckless
indifference for the rights of others, or behavior even more
deplorable." Baker, 554 U.S. at 493 (internal quotation marks
omitted). Therefore, to state a facially plausible claim for
punitive damages, Plaintiffs must allege facts sufficient for
"the court to draw the reasonable inference" that Defendants
acted with at least gross negligence. Iqbal, 556 U.S. at 678.
"[A] formulaic recitation of the elements of" a punitive damages
claim "will not do." See Twombly, 550 U.S. at 555.

Most, if not all, of the allegations in Plaintiffs'
complaints in these cases do not meet that standard. Plaintiffs
allege generally that Defendants maintained their ships in an
unseaworthy condition with reckless indifference and disregard
for Plaintiffs' safety. See, e.g., Sanchez v. A-C Prod. Liab.
Trust, No. 09-30169, Compl. ¶ 19. The complaints do not include
any factual allegations to support that assertion, instead
merely reciting the elements of a punitive damages claim. Such
allegations are insufficient to satisfy the pleading standard
articulated in Twombly and Iqbal. See Twombly, 550 U.S. at 555
("[A] formulaic recitation of the elements of a cause of action
will not do.").

Ordinarily, that conclusion would entitle Defendants to a
judgment on the merits. Here, however, Plaintiffs filed their

complaints before the Supreme Court issued its decisions in Twombly and Iqbal, and thus they could reasonably have believed that under the Conley standard then in place their pleadings complied with Rule 12(b)(6). See Conley v. Gibson, 355 U.S. 41 (1957), abrogated by Twombly, 550 U.S. at 561-63. The Court will therefore afford Plaintiffs the opportunity, if appropriate under the facts of the specific case, to file an amended complaint that complies with the current pleadings standard.

## IV.  CONCLUSION

The Court concludes that punitive damages are available as a matter of law to seamen bringing actions based upon the general maritime doctrine of unseaworthiness. They are unavailable, however, in wrongful death and survival actions, and thus the Court will grant Defendants' motion as to all Plaintiffs bringing wrongful death and survival actions.

Two, there is no general bar against awarding punitive damages in litigation involving exposure to asbestos. However, this type of award may be subject to limitations under the Due Process Clause and in conformity with maritime law.

Three, Plaintiffs' complaints must comply with the current pleading standard under Federal Rule of Civil Procedure 12(b)(6). As most, if not all, of Plaintiffs' claims fail to satisfy that standard, the Court will grant Defendants' motions

on that basis, but accord certain Plaintiffs the opportunity to file an amended complaint, if they so desire. An appropriate order follows.

# Exhibit A

| Case Number | District | Caption | Filed by | Doc. No. |
|---|---|---|---|---|
| 11-30077 | OH-N | Adams et al v. A-C Product Liability Trust et al | Atlantic Richfield Co. | 79 |
| 11-30142 | OH-N | Benjamin et al v. A-C Product Liability Trust et al | Sinclair Refining Company | 70 |
| 11-30144 | OH-N | Bermudez et al v. Foster Wheeler Company et al | Sinclair Refining Company | 93 |
| 11-30155 | OH-N | Blackburn v. A-C Product Liability Trust | Richfield Oil Corporation | 95 |
| 11-30259 | OH-N | Fish et al v. A-C Product Liability Trust et al | Continental Steamship Co. Sinclair Refining Company | 113 |
| 11-30325 | OH-N | Daniel et al v. Foster Wheeler Company et al | Sinclair Refining Company | 101 |
| 11-31593 | OH-N | Mcmahon et al v. A-C Product Liability Trust et al | Cleveland Cliffs Iron Company | 54 |
| 11-31714 | OH-N | Eng v. Foster Wheeler Company et al | Cleveland Cliffs Iron Company Cleveland Cliffs S.S. Company | 66 |
| 11-31742 | OH-N | Hakkila et al v. Foster Wheeler Company et al | Cleveland Cliffs Iron Company Cleveland Cliffs S.S. Company | 81 |
| 11-32123 | OH-N | Mcguire et al v. A-C Product Liability Trust et al | Cleveland Cliffs Iron Company | 83 |
| 11-32131 | OH-N | Gurnoe et al v. A-C Product Liability Trust et al | Cleveland Cliffs S.S. Company | 89 |
| 11-33888 | MI-E | Jacobson et al v. Trinidad Corporated et al | National Bulk Carriers, Inc. | 138 |
| 10-30663 | OH-N | Miller v. A-C Product Liability Trust et al | Cleveland Cliffs S.S. Company | 93 |
| 11-30182 | OH-N | Brooks v. A-C Product Liability Trust et al | North American Trailing Co. | 118 |
| 10-30907 | OH-N | Miller v. A-C Product Liability Trust et al | Inland Lakes Management Inc. | 64 |
| 11-30128 | OH-N | Basley v. A-C Product Liability Trust et al | M. A. Hanna Company | 74 |
| 09-30169 | OH-N | Sanchez v. A-C Product Liability Trust et al | Coastal Tankships USA, Inc. Exxon Mobil Corporation Mobil Oil Corporation | 104 |
| 09-30270 | OH-N | Vetsikas v. A-C Product Liability Trust et al | Exxon Mobil Corporation Mobil Oil Corporation | 111 |
| 09-30392 | OH-N | Bartel (Palermo) et al v. A-C Product Liability Trust et al | Farrell Lines Incorporated Keystone Shipping Co. Marine Transport Lines, Inc. Mathiasen Tanker Ind. Inc. Trinidad Corporation | 119 |
| 09-30305 | OH-N | Llanes v. A-C Product Liability Trust et al | Coscol Marine Corp Delta Steamship Lines Inc. Sea-Land Service Inc. Transoceanic Cable Ship Company, Inc. | 78 |

| | | | | |
|---|---|---|---|---|
| 09-30216 | OH-N | Frederick v. A-C Product Liability Trust et al | Interocean Management Corp.<br>Ocean Ships Inc.<br>Ogden Clover Transport, Inc.<br>Ogden Leader Transport Inc<br>Omi Bulk Management Co.<br>Omi Champion Transport, Inc.<br>Omi Chem Transport<br>Omi Corporation<br>Omi Leader Corp.<br>Omi Leader Transport Inc<br>Pacific Gulf Marine Inc.<br>Red Circle Transport Company<br>United Fruit Company<br>Westchester Marine Corp | 91 |
| 09-30143 | OH-N | Jacobs v. A-C Product Liability Trust et al | Alcoa Steamship Company, Inc.<br>American Steamship Co.<br>Amersand Steamship Company<br>Boland & Cornelius<br>Pickands Mather & Co.<br>Reiss Steamship Company | 98 |
| 09-30166 | OH-N | Lancour v. A-C Product Liability Trust et al | Interlake Steamship Company<br>Pickands Mather & Co.<br>Reiss Steamship Company | 87 |
| 09-30179 | OH-N | Mccarty v. A-C Product Liability Trust et al | American Steamship Co.<br>Reiss Steamship Company | 66 |
| 09-91156 | OH-N | Bartel (Olson) et al v. A-C Product Liability Trust et al | Boland & Cornelius<br>Chiquita Brands International, Inc.<br>Reiss Steamship Company<br>Rockport Steamship Company<br>United Fruit S.S. Co. | 60 |
| 11-33480 | OH-N | Montalvo et al v. A-C Product Liability Trust et al | American Export Isbrandtsen<br>American Export Lines Inc.<br>American South African Lines<br>Central Gulf Lines, Inc.<br>Central Gulf Steamship Corporation<br>Marine Transport Lines Inc.<br>United Fruit Company | 52 |
| 11-33883 | MI-E | Hawkins et al v. American Mail Lines et al | Alaska Steamship Company | 109 |